IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gary M. Sederbaum, | ) | C/A No.: 1:14-1777-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On April 20, 2011, Plaintiff filed an application for DIB in which he alleged his disability began on May 16, 2005. Tr. at 89, 223–24. His application was denied initially and upon reconsideration. Tr. at 121–24, 127–28, 129–30. On October 11, 2012, Plaintiff

had a hearing before Administrative Law Judge ("ALJ") Roseanne P. Gudzan. Tr. at 53–78 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 26, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 35–52. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 1, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 34 years old at the time of the hearing. Tr. at 56. He completed high school and a year-and-a-half of college. *Id.* His past relevant work ("PRW") was as a construction supervisor, a home builder, and a bush hogger. Tr. at 70–71. He alleges he has been unable to work since February 23, 2011.[1] Tr. at 58.

2.    Medical History

a.    Medical Records Considered by ALJ

On February 12, 2008, Rudolph B. Rustin, M.D. ("Dr. Rustin"), wrote a letter indicating Plaintiff was fully disabled. Tr. at 350. He described the progression of Plaintiff's impairment, which began in 1996. *Id.* He noted that another physician in his practice had diagnosed active pan-colitis, removed Plaintiff's large intestine, and created a J-Pouch. *Id.* He indicated Plaintiff developed a rectal stricture in 2001. *Id.* He explained

---

[1] Plaintiff amended his alleged onset date ("AOD") during the hearing on October 11, 2012. Tr. at 58.

that Plaintiff presented to his office with an anal stricture in 2004 and that his pouch demonstrated features consistent with Crohn's disease at that time. *Id.* Dr. Rustin wrote that Plaintiff began having problems with abscesses and fistula formation. *Id.* He explained that in May 2005, Plaintiff's J-Pouch was removed and a permanent ileostomy was created. *Id.* He indicated Plaintiff developed fistulas in April 2006 and December 2007. Tr. at 350–51.

Plaintiff received Remicade infusions from Palmetto Infusion Services ("PIS") on February 8, 2010, April 5, 2010, and June 1, 2010, and was noted to be receiving infusions every eight weeks. Tr. at 398–400.

Plaintiff presented to Michael D. Wilcox, M.D. ("Dr. Wilcox"), on May 13, 2010. Tr. at 416. He acknowledged doing well on his medication regimen and discussed coping skills and anger control. *Id.* Dr. Wilcox assessed as GAF score[2] of 65. Tr. at 418.

On June 15, 2010, Plaintiff presented to Hilton Head Gastroenterology for a six-month follow up. Tr. at 369. He reported being under a lot of stress and experiencing some discomfort and drainage in his rectal area, but feeling good overall. *Id.* He reported

---

[2]The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* GAF scores above 70 generally indicate an absence of symptoms and no more than slight impairment. *Id.* GAF scores between 61 and 70 suggest that the individual has mild symptoms, but is generally functioning well in social, occupational, and/or school settings. *Id.* GAF scores between 51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational, and/or school functioning. *Id.* GAF scores below 50 suggest serious symptoms or serious impairment in social, occupational, and/or school functioning. *Id.*

no adverse effects from Remicade infusions. *Id.* On July 21, 2010, Plaintiff was noted to be undergoing Remicade infusions every six weeks. Tr. at 396.

On August 3, 2010, Plaintiff described his pain as aching, tender, throbbing, miserable, sharp, shooting, and nagging. Tr. at 542. He indicated his pain to be an eight of ten. Tr. at 542. He stated his pain affected his physical activity, mood, and energy and noted he was drowsy/tired. *Id.* However, during an infusion visit on December 1, 2010, Plaintiff denied problems. Tr. at 537.

Plaintiff followed up with Dr. Wilcox on December 3, 2010. Tr. at 417. He reported doing fair and having good control of his mood despite stress from his job and financial problems. *Id.* However, he complained of difficulty with sleep and stated Xanax had become less effective. *Id.* Dr. Wilcox prescribed Ambien and Valium and continued Plaintiff's prescription for Adderall XR. *Id.*

Plaintiff followed up at Hilton Head Gastroenterology on December 6, 2010. Tr. at 371. He reported he was going on tractor duty and needed a prescription for Vicodin. *Id.* He complained of increased drainage when engaging in physical activity and when nearing the time for another Remicade infusion. *Id.* Plaintiff was instructed to continue Remicade infusions every eight weeks. *Id.*

On January 6, 2011, Plaintiff presented to Hilton Head Gastroenterology with increased pressure and severe cramps in his lower abdomen and rectum. Tr. at 373. He was referred for lab tests and x-rays. *Id.* An x-ray of his abdomen indicated a nine millimeter metallic foreign body in the lower sacrum, a surgical clip over the medial aspect of the left iliac wing, and a right lower quadrant ileostomy. Tr. at 381. Plaintiff

4

followed up on January 17, 2011, and reported feeling better and having no drainage. Tr. at 375. He reported no problems during an infusion visit on January 26, 2011. Tr. at 539.

Plaintiff followed up at Hilton Head Gastroenterology on April 5, 2011. Tr. at 377. He reported increased drainage from a painful area near his rectum. *Id.* Plaintiff's physician noted a quarter-sized bulge near Plaintiff's tailbone. *Id.* The physician drained pus from the area, and Plaintiff reported that he felt better. *Id.* The provider ordered a pelvic x-ray, which indicated a small radiopaque foreign body projected over the sacrum on the frontal view, but not on the lateral view. Tr. at 379. The x-ray was otherwise normal. *Id.*

On June 3, 2011, Plaintiff complained to Angela Saito, M.D. ("Dr. Saito") at PIS that he experienced nausea, bloody stools, and abdominal pain. Tr. at 532. Plaintiff also indicated metal clips from prior surgeries caused him to experience inflammation and pain. *Id.*

State agency medical consultant Cleve Hutson, M.D., completed a physical residual functional capacity ("RFC") assessment on July 11, 2011. Tr. at 84–86. He found Plaintiff to have the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps/stairs, kneel, and crouch; occasionally crawl; never climb ladders/ropes/scaffolds; and should avoid even moderate exposure to hazards (machinery, heights, etc.). Tr. at 85–86.

On July 12, 2011, Dr. Wilcox wrote a letter stating he treated Plaintiff from June 24, 2005, through December 3, 2010. Tr. at 415. He indicated Plaintiff's diagnoses

included major depressive disorder (recurrent, in remission), attention deficit hyperactivity disorder (inattentive type), and anxiety disorder, not otherwise specified ("NOS"). *Id.* Although he indicated Plaintiff's symptoms were stabilized on his current medications, he also noted that Plaintiff's depression and anxiety were worsened by exacerbations of Crohn's disease. *Id.*

During an infusion visit on July 25, 2011, Plaintiff complained to Dr. Saito of nausea, vomiting, abdominal cramping, bloody stools, headache, weakness, fatigue, numbness/tingling, and joint swelling. Tr. at 525.

Plaintiff followed up with Dr. Wilcox on August 3, 2011, and reported increased stress because of finances, health issues, and his wife's recent motor vehicle accident that resulted in the loss of her job. Tr. at 420. He complained of easy anger, frustration, anxiety, depression, and hopelessness. *Id.* He also reported destroying property because of his anger and frustration. *Id.* Dr. Wilcox indicated Plaintiff had fair energy, appetite, and interest, but poor concentration and isolative sociability. *Id.* Dr. Wilcox assessed Plaintiff as having increased problems with social and health stressors and mood instability and restarted Plaintiff on Effexor XR. *Id.*

Dr. Wilcox wrote a follow up letter on August 15, 2011, in which he indicated he had last treated Plaintiff on August 3, 2011. Tr. at 419. He wrote that at his last visit, Plaintiff had symptoms of depression and anxiety leading to easy frustration and anger. *Id.* He noted "[i]n my opinion, Mr. Sederbaum's depression and anxiety symptoms are worsened with exacerbations of his Crohn's disease." *Id.*

On August 19, 2011, state agency consultant Michael Neboschick, Ph. D., completed a psychiatric review technique form ("PRTF"). Tr. at 82–83. He considered Listings for organic mental disorders, affective disorders, and anxiety-related disorders. Tr. at 82. He found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 83.

During an infusion visit on September 20, 2011, Plaintiff reported to Dr. Saito that his symptoms included nausea, vomiting, diarrhea three times per day, bloody stools, headache, weakness, swelling on the left side of his back, fatigue, numbness/tingling, joint swelling, and body aches. Tr. at 519.

Plaintiff presented to Doctors Care on October 9, 2011, complaining of pain in his lower back. Tr. at 425. The provider noted tenderness to palpation in Plaintiff's right lumbar paraspinals, but full range of motion and intact strength and sensation. *Id.* Plaintiff was diagnosed with a lumbar strain and lower back pain. *Id.*

On November 21, 2011, state agency medical consultant Jean Smolka, M.D., completed a physical RFC assessment and found Plaintiff to be limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, stoop, and crouch; occasionally crawl; never climb ladders/ropes/scaffolds; and avoid even moderate exposure to hazards (machinery, heights, etc.). Tr. at 98–100.

Plaintiff presented to Aaron B. Domm, M.D. ("Dr. Domm"), on December 5, 2011, to establish care for Crohn's disease. Tr. at 485. Dr. Domm indicated Plaintiff's Crohn's disease was "maintained under relatively good control with Remicade." *Id.* Plaintiff denied nausea and vomiting and reported approximately four bowel movements per day through his ileostomy. *Id.* Plaintiff complained of rectal pressure, and Dr. Domm noted that an x-ray showed metal consistent with clips from previous surgery. *Id.* He recommended Plaintiff establish care with Summar Phillips, M.D., for chronic pain and establish primary care with University Family Medicine. Tr. at 486. He also discussed with Plaintiff seeing Jorge A. Lagares Garcia, M.D. ("Dr. Lagares Garcia") for possible ileostomy takedown. *Id.*

State agency consultant Olin Hamrick, Jr., Ph. D., completed a PRTF on December 15, 2011, and considered Listings for organic mental disorders, affective disorders, and anxiety-related disorders. Tr. at 96–97. He determined Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 97.

Dr. Domm wrote a letter to Plaintiff's other physicians on December 18, 2011, indicating a recent DEXA scan revealed that Plaintiff had osteopenia. Tr. at 483.

During a December 28, 2011, visit to Pain Care Physicians of Charleston (PCPC), Plaintiff described his pain as an eight of ten in his thoracic area, buttocks, and pelvis. Tr. at 553. He indicated his pain was associated with weakness. *Id.*

State agency medical consultant Katrina B. Doig, M.D., completed a physical RFC assessment on January 5, 2012. Tr. at 113–15. She indicated Plaintiff was limited as

8

follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, kneel, and crouch; occasionally crawl; never climb ladders/ropes/scaffolds; and avoid even moderate exposure to hazards (machinery, heights, etc.). *Id.*

On January 23, 2012, Dr. Domm reported "everything good" and instructed Plaintiff to continue Remicade infusions every six weeks and to follow up in one year. Tr. at 484.

Plaintiff followed up with Shaughnessy V. Mullen, M.D. ("Dr. Mullen"), at PCPC on January 23, 2012. Tr. at 557. Dr. Mullen noted Plaintiff was started on Methadone at his prior visit and complained of nausea and sweating. *Id.* Dr. Mullen encouraged Plaintiff to continue taking the Methadone. *Id.* Plaintiff indicated the Methadone was greatly relieving his abdominal pain for 12 hours at a time. *Id.* Plaintiff described his pain as a two of ten. *Id.*

Plaintiff reported poor energy and motivation and increased anxiety and isolation to Dr. Wilcox on January 26, 2012. Tr. at 570. Dr. Wilcox increased Plaintiff's dosage of Effexor. *Id.*

Plaintiff presented to Cashton Spivey, Ph. D. ("Dr. Spivey"), for a psychological evaluation on January 27, 2012. Tr. at 447–50. Plaintiff scored 30 of a possible 30 points on the Mini-Mental State Examination ("MMSE"). Tr. at 449. He demonstrated no difficulty in performing serial 7s or recalling three objects after five minutes. *Id.* His language skills were intact. *Id.* He was oriented to time, place, and person. *Id.* He

followed a three-step command, accurately reproduced a drawing, and demonstrated a satisfactory general fund of information and fair abstract reasoning abilities. *Id.* His insight and judgment were fair to good, and his intelligence score was in the average range. *Id.* Plaintiff's mood was mildly sad, but his affect was appropriate. *Id.* His attention and concentration were satisfactory. *Id.* Dr. Spivey diagnosed attention deficit hyperactivity disorder, depressive disorder, NOS, and anxiety disorder, NOS. *Id.* He assessed a GAF score of 55 with a highest GAF of 60 within the previous 12-month period. *Id.* Dr. Spivey indicated Plaintiff was capable of understanding complex and simple instructions and performing complex and simple tasks. *Id.*

During an infusion visit on February 6, 2012, Plaintiff complained of nausea, vomiting, and fatigue. Tr. at 512. Dr. Saito indicated Plaintiff was recently diagnosed with Paget's disease.[3] *Id.*

On February 8, 2012, state agency consultant Camilla Tezza, Ph. D., completed a PRTF and considered Listings for organic mental disorders, affective disorders, and anxiety-related disorders. Tr. at 111–12. She assessed Plaintiff's impairment as imposing

---

[3] Paget's disease is a bone disease that causes an individual's bones to grow too large and weak and to break easily. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2015. Paget's Disease of Bone; [updated 2014 December 23; cited 2015 May 18]. Available from: http://www.nlm.nih.gov/medlineplus/pagetsdiseaseofbone.html. The disease can lead to other health problems, including arthritis and hearing loss. *Id.* It most commonly affects the spine, pelvis, skull, and legs and may affect one or several bones. *Id.* Symptoms of Paget's Disease can include pain, enlarged bones, broken bones, and damaged cartilage in joints. *Id.* A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. Tr. at 112.

On February 15, 2012, Plaintiff reported to Dr. Mullen that he had been in bed since doing yard work the previous weekend. Tr. at 559. He indicated the Methadone was no longer controlling his pain as well as it had been at the last visit. *Id.* Plaintiff stated his pain was a five of ten. *Id.* Dr. Mullen indicated Plaintiff's interval pain control to be good, except when he engaged in physical exertion, which seemed to incapacitate him. *Id.*

Plaintiff followed up with Dr. Weathers on March 5, 2012, for osteopenia. Tr. at 476. He reported improvement on medication and no side effects. *Id.* Plaintiff indicated he experienced chronic abdominal pain, decreased libido, and low back pain. *Id.* Dr. Weathers ordered multiple lab tests and an x-ray of Plaintiff's lumbosacral spine. Tr. at 477.

On March 12, 2012, Plaintiff complained to Dr. Mullen of pain in his pelvic area and throughout his body with physical exertion. Tr. at 561. He described his pain as a five of ten. *Id.* Dr. Mullen noted Plaintiff's pain was fairly well controlled, but flared when he was "active, as when riding a tractor or 'work,' getting ready for hunting season." *Id.*

Plaintiff presented to Dr. Weathers on March 16, 2012, for osteopenia, vitamin D deficiency, and low libido. Tr. at 474. Dr. Weathers noted that testing revealed Plaintiff's

testosterone to be in the borderline range. Tr. at 475. She indicated she would recheck Plaintiff's testosterone and vitamin D levels at a two-month follow up visit. *Id.*

During his March 27, 2012, visit to PIS for Remicade infusion, Plaintiff complained of nausea, vomiting, diarrhea five times per day, numbness and tingling in his arms, joint swelling, and muscle spasms. Tr. at 502.

An x-ray of Plaintiff's lumbar spine on March 31, 2012, indicated straightening, but no acute process. Tr. at 471.

On May 2, 2012, Plaintiff presented to Dr. Lagares Garcia for a new patient visit. Tr. at 461. Plaintiff endorsed symptoms that included dark, tarry stools, rectal bleeding, vomiting, painful joints, depressed mood, and difficulty sleeping, but denied all other abnormal symptoms. Tr. at 462. Dr. Lagares Garcia noted no abnormalities on examination. *Id.* He assessed regional enteritis of the small intestine and large intestine and Crohn's disease. *Id.* He recommended Prometheus testing and consultation with a rheumatologist, but further invasive procedures were contraindicated. *Id.* Prometheus testing yielded normal results. Tr. at 470.

On May 8, 2012, Plaintiff followed up with Dr. Weathers regarding osteopenia, vitamin D deficiency, and low back pain. Tr. at 472. He reported decreased pain with use of medication. *Id.* Dr. Weathers ordered several tests and referred Plaintiff to a rheumatologist. Tr. at 473.

Plaintiff followed up with Dr. Mullen on May 9, 2012, for medication management. Tr. at 563. He reported his abdominal pain as a five of ten, but indicated his medication allowed him to perform his normal activities. *Id.* Dr. Mullen noted Plaintiff

was taking Effexor for anger management and enjoying activity, including fishing. Tr. at 563.

During his May 14, 2012, visit to PIS for Remicade infusion, Plaintiff reported low back pain. Tr. at 495. He also complained to Dr. Saito of diarrhea, abdominal cramping, and pain. Tr. at 500.

Plaintiff followed up with Dr. Weathers on May 25, 2012, for moderate low back pain. Tr. at 467–69. Dr. Weathers noted no abnormalities on examination. Tr. at 467–68. She assessed uncontrolled Crohn's disease and uncontrolled back pain. Tr. at 468. Dr. Weathers indicated paperwork was filled out, but stated she could not explain Plaintiff's complaint that his "whole body hurts." *Id.* She again referred Plaintiff to a rheumatologist. *Id.*

On June 11, 2012, Plaintiff reported to Dr. Domm that he was doing well other than experiencing some joint pain and fatigue. Tr. at 481. Dr. Domm noted no abnormalities and referred Plaintiff to a rheumatologist. Tr. at 481–82.

Plaintiff presented to Dr. Mullen for medication follow up on July 18, 2012, and reported his abdominal pain as an eight of ten. Tr. at 565. He stated the Methadone was only giving him seven to eight hours of relief at a time. *Id.* Plaintiff indicated he felt bad, particularly after boating and fishing on Lake Moultrie. *Id.* Dr. Mullen described Plaintiff's gait as antalgic and noted that Plaintiff had some lumbar paraspinal tenderness and a positive straight-leg raise at 45 degrees. Tr. at 565–66. He increased Plaintiff's prescription for Methadone from 20 milligrams to 40 milligrams twice daily and prescribed Flexeril. Tr. at 566.

13

On June 25, 2012, Plaintiff presented to Alan N. Brown, M.D. ("Dr. Brown"), for a rheumatology consultation. Tr. at 491. Dr. Brown noted that Plaintiff complained of widespread arthralgias and pain that had lasted for a year. *Id.* Plaintiff reported that his pain increased with activity and that he experienced occasional swelling in his hands and right knee. *Id.* Dr. Brown indicated Plaintiff demonstrated full range of motion of all joints and no tenderness to palpation over his sacroiliac joints. *Id.* He explained that Plaintiff's pain was not likely related to enteropathic arthritis, drug-induced lupus, or any other rheumatologic source. *Id.*

Plaintiff saw Dr. Wilcox on July 20, 2012, and indicated he was on an emotional rollercoaster with health and financial problems. Tr. at 569. He indicated he frequently cried during the day and felt overwhelmed. *Id.* He stated his energy and motivation were mixed and that he felt guilty and useless. *Id.* Dr. Wilcox wrote a letter indicating Plaintiff's medications were recently adjusted and that his depression and anxiety symptoms were worsened with exacerbations of Crohn's disease. Tr. at 568.

b.       New Records Considered by Appeals Council

Dr. Rustin examined and surgically debrided Plaintiff's unhealed perineal wound on January 4, 2008. Tr. at 575.

Plaintiff presented to Theodore G. Gourdin, M.D. ("Dr. Gourdin"), on April 14, 2008, for treatment of Crohn's disease. Tr. at 676–77. Dr. Gourdin observed Plaintiff to have perianal tenderness and a sinus tract on the left lateral side of his anus. Tr. at 676. He assessed recurrent anal wound with apparent fistula formation and recommended Plaintiff initiate Remicade therapy. Tr. at 677.

On May 25, 2012, Dr. Weathers completed a medical release/physician's statement for the South Carolina Department of Social Services. Tr. at 658. She indicated Plaintiff's disability was permanent and that he needed a full-time caregiver because of Crohn's disease, back pain, and osteoporosis. *Id.* She wrote "[h]e cannot do certain activities of daily living because of pain. Wife must help him at this point." *Id.* Dr. Weathers provided the same statement again on February 27, 2013. Tr. at 656.

On June 11, 2012, Plaintiff reported to Dr. Weathers that he was doing well, aside from joint pain and fatigue. Tr. at 648. However, during his infusion visit on July 17, 2012, Plaintiff reported his pain to be an eight of ten. Tr. at 613.

Plaintiff reported a rash to Dr. Weathers on September 27, 2012. Tr. at 643. Dr. Weathers observed Plaintiff to have a red scrotum and improving red macerated areas in his bilateral groin folds. *Id.* She assessed Plaintiff to have an improving yeast infection, vitamin D deficiency, improving cellulitis, and a superficial injury to his scrotum without infection. *Id.* An ultrasound of Plaintiff's testes and scrotum on October 2, 2012, revealed a small left-sided varicocele.[4] Tr. at 673.

On January 14, 2013, Plaintiff reported side effects from Remicade infusion. Tr. at 607. He indicated he had three days of extreme fatigue and was unable to do anything during those days. *Id.* He complained of nausea, abdominal cramping, and heartburn and

---

[4] "A varicocele is the swelling of the veins inside the scrotum." A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2015. Varicocele; [updated 2013 October 2; cited 2015 May 15]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/001284.htm. "A varicocele forms when valves inside the veins that run along the spermatic cord prevent blood from flowing properly," which leads to swelling and widening of the veins. *Id.*

stated that the frequency with which he needed to empty his colostomy bag depended on how much he ate. *Id.* Plaintiff indicated he was experiencing weakness, fatigue, numbness/tingling, and joint swelling. *Id.*

On January 15, 2013, Dr. Domm noted that Plaintiff had an enlarging abscess and complained of fatigue and abdominal pain that "popped" and was "pushing up into" his scrotum. Tr. at 626. Dr. Domm noted that Plaintiff had waited seven weeks between his last and his most recent Remicade infusions. *Id.* He observed Plaintiff to have multiple abscesses and drainage. *Id.* Dr. Domm assessed a superficial injury to Plaintiff's scrotum without infection and referred him to a colorectal surgeon. Tr. at 627.

Plaintiff followed up with Dr. Weathers on February 5, 2013. Tr. at 639. Plaintiff reported that the rash on his groin had not improved and that he was experiencing nausea on Remicade. Tr. at 639. Dr. Weathers observed Plaintiff to have an inflamed maceration in his groin folds. Tr. at 640. She assessed Plaintiff to have an uncontrolled yeast infection, vitamin D deficiency, and a superficial injury to his scrotum without infection. *Id.*

A CT of Plaintiff's pelvis on February 8, 2013, indicated perirectal inflammatory change with multiple fistulous tracts and small bowel adhesions, but no evidence of pelvic abscess. Tr. at 672.

Plaintiff presented to Dr. Gourdin for further evaluation of Crohn's disease, abdominal discomfort, and intermittent nausea/vomiting on February 14, 2013. Tr. at 662–63. He reported a foul smell and discharge of blood and mucous from the fistula around his scrotum. Tr. at 662. He complained of increased fatigue and intermittent

nausea, vomiting, and lower abdominal pain. *Id.* During an infusion visit on February 25, 2013, Plaintiff reported his pain to be an eight of ten. Tr. at 664.

Plaintiff underwent esophagogastroduodenoscopy ("EGD") on February 26, 2013, which revealed reflux changes, but an otherwise normal stomach and duodenum. Tr. at 665. Biopsies of Plaintiff's duodenum, stomach, and esophagus were benign, but Plaintiff had moderate active gastritis, positive immunohistochemical stains for Heliobacter organisms, and evidence of reflux. Tr. at 666. An ultrasound of Plaintiff's abdomen indicated hepatomegaly and hepatic steatosis. Tr. at 668.

c.    Records Not Considered by Appeals Council

Plaintiff presented to Dr. Lagares Garcia on February 6, 2013, for scrotal pain. Tr. at 18–21. Plaintiff indicated he was experiencing nausea, rectal bleeding, vomiting, and dark, tarry stools. Tr. at 19. He also complained of painful joints, depressed mood, and difficulty sleeping. *Id.* Dr. Lagares Garcia indicated Plaintiff had large swelling over the base of his scrotum with a possible fistulous tract from the perianal area. *Id.* He assessed diagnoses of Crohn's colitis and anal fistula and referred Plaintiff for an examination with a urologist. *Id.*

On February 6, 2013, Plaintiff presented to David W. Brandli, M.D. ("Dr. Brandli"). Tr. at 9–11. He complained of mild-to-moderate pain and swelling in his scrotum and stated the pain began months earlier. Tr. at 9. Dr. Brandli observed a small knot on the left of Plaintiff's scrotum. Tr. at 10. He diagnosed a scrotal mass and ordered a CT of Plaintiff's pelvis. Tr. at 11.

17

Plaintiff presented to Dennis J. Kubinski, M.D. ("Dr. Kubinski"), for a second opinion regarding testicular pain on February 11, 2013. Tr. at 15–16. Dr. Kubinski noted that, despite Plaintiff's colostomy, he had problems with recurrent fistulas until he started Remicade. Tr. at 15. However, he observed during the examination that Plaintiff had a sinus tract in his left buttocks and a small tract in his right groin lateral to his scrotum. *Id.* Dr. Kubinski palpated a nontender pea-sized nodular area between Plaintiff's scrotum and perineum. *Id.* He indicated it was mobile and that he was unable to express anything from it. *Id.* Dr. Kubinski indicated the nodular area was contiguous with an inflammatory strand emanating from Plaintiff's anus. *Id.* He assessed pelvic and perineal pain and indicated that Plaintiff had no primary urologic issue, but that the nodular area was "almost certainly related to his previous fistulas and perianal inflammation." Tr. at 16. Dr. Kubinski indicated Plaintiff should undergo an MRI. *Id.*

### 3.    Lay Witness Statements

#### a.    Included in Record Before ALJ

Sandra M. Mudger ("Ms. Mudger"), human resource director for Sunburst Properties, wrote a letter on September 13, 2007, in which she indicated Plaintiff became seriously ill and was unable to work for a three-month period soon after he started working for the company. Tr. at 368. She wrote that Plaintiff "worked when he could" and sometimes left early or came in late as a result of his illness. *Id.* She further indicated "[d]ue to his medical condition he must take time for himself when needed." *Id.*

On February 23, 2011, Brad Libhart ("Mr. Libhart"), project manager for Sunburst Properties, wrote a letter indicating Plaintiff was terminated from employment due to a

failing housing market. Tr. at 367. Mr. Libhart wrote that Plaintiff was a very valued employee, worked well with other employees and homeowners, would be missed, and would be a valuable employee to another company. *Id.*

b.     Incorporated in Record at Appeals Council

On February 5, 2013, Plaintiff's wife Heather Sederbaum ("Mrs. Sederbaum") wrote a letter in which she described her husband's limitations and daily functioning. Tr. at 315–16. She indicated Plaintiff struggled with pain and fatigue and that his medications altered his mood. Tr. at 315. Mrs. Sederbaum pointed out that Plaintiff's former employer was very accommodating and allowed him to miss five to seven days of work per month due to illness. *Id.* She wrote that Plaintiff rarely ate dinner with his family; could not perform household chores or yard work; did not attend his children's school events or help them with homework; and could not sit or stand for long periods. *Id.* She indicated Plaintiff required reminders to empty his colostomy bag and to move around. *Id.* Mrs. Sederbaum wrote that Plaintiff's Remicade infusions caused him to experience extreme fatigue, nausea, vomiting, extreme tiredness, severe depression, and deep anxiety and to miss two to three days of work per month during the time he was employed. Tr. at 316. She indicated Plaintiff was unable to be left alone because of his Methadone dosage and that either she or her mother-in-law stayed with him at all times. *Id.*

In a letter dated February 6, 2013, H. Bruce Dingler wrote that he attended church with Plaintiff and indicated Plaintiff tired quickly, experienced pain while walking,

required restroom breaks during church services, and was unable to perform chores in his home or yard. Tr. at 319.

Plaintiff's mother Brenda Sederbaum wrote a letter dated February 8, 2013, and indicated Plaintiff and his family had to move into her home after he was laid off from his job. Tr. at 324. She wrote that Plaintiff's condition had worsened and described him as being in constant pain, tired all the time, depressed, and frustrated. *Id.* She indicated Plaintiff was unable to cook, wash dishes, clean, or assist his children with their homework. *Id.*

In an undated letter, Plaintiff's minister, Dr. Jim Palmer, wrote that Plaintiff had struggled with gastric issues over the decade he had known him and that his condition had worsened. Tr. at 330. He indicated Plaintiff's condition was sometimes manageable, but was generally difficult and debilitating. *Id.*

### 4.     Other Agency Decision

On March 4, 2009, Hearing Officer ("HO") Kimberly B. Burrell with the South Carolina Department of Health and Human Services ("SCDHHS") issued an administrative decision in Plaintiff's Medicaid Working Disabled ("WD") claim. Tr. at 354–58. The decision indicated "Disability for the Medicaid WD program is established using a modified Social Security Administration (SSA) sequential evaluation process" that begins at step two of the SSA sequential evaluation process. Tr. at 355. At step two, the HO found that Plaintiff's severe impairments were gastrointestinal and included Crohn's disease, perianal disease, recurring fistula, and IV Remicade treatments. *Id.* At step three, the HO determined Plaintiff's severe impairment medically equaled the

requirements of Listing 5.06(C). *Id.* The HO found that Plaintiff met "the categorical criterion for the Medicaid WD purposes, effective February 1, 2008." Tr. at 358.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on October 11, 2012, Plaintiff testified he lived with his wife and two children, ages six and eleven, in his mother's home. Tr. at 56, 60. He indicated he was 6'1" and weighed 245 pounds. Tr. at 57–58. Plaintiff denied having worked since February 23, 2011. Tr. at 59. He stated he stopped working because his employer sold the properties he maintained and let him go. *Id.* He indicated he looked for other work as a superintendent, but was unable to find anything because of his impairments and the number of work days he was expected to miss because of it. Tr. at 59, 69.

Plaintiff testified he became ill when he was in the eleventh grade, was hospitalized, and lost 100 pounds in a week. Tr. at 65. He stated his large intestine had multiple ulcers and had to be removed. *Id.* He indicated he initially had a J-pouch, but subsequently underwent ileostomy in 2005. *Id.* Plaintiff testified he was not allowed to lift over two pounds, stoop, crawl, kneel, climb a ladder, or swing a hammer. *Id.* He testified he received Remicade every six weeks that caused him to be very fatigued for two to three days each time. Tr. at 60, 62. Plaintiff indicated he experienced six to seven bad days per month in which he was unable to work. *Id.* He testified he had used a colostomy bag since 2005. Tr. at 61. He indicated stooping, crouching, and bending placed pressure on the bag, creating a possibility for the seam on the bag to burst and the

feces to come out. *Id.* He indicated swinging a hammer put stress on his abdomen and lifting made it more likely that he would develop a hernia. *Id.* He stated he wore his colostomy bag between his boxer shorts and pants and under three layers of shirts. *Id.* Plaintiff testified that excessive heat caused him to sweat more, irritated his skin, and increased the likelihood that the bag would burst. Tr. at 62. He stated he had been diagnosed with osteoporosis, which his doctors indicated was caused by his use of steroids, including Remicade. Tr. at 63. Plaintiff testified he experienced pain throughout his body, but mainly in his lower back and abdomen. Tr. at 65.

Plaintiff testified he was diagnosed with anxiety, as well, that was caused by his self-consciousness regarding his colostomy bag. Tr. at 64. He indicated he feared something would go wrong with the bag and was bothered by its sounds. *Id.* Plaintiff stated he took Valium and held his hand over his stomach to muffle its sounds and to make himself more comfortable around others. *Id.* Plaintiff testified that the frequency of his bathroom breaks was dependent on his food intake and ranged from two to six times per day. *Id.* He indicated he tried not to eat when going out in public. *Id.*

The ALJ asked Plaintiff about references in the medical records to him riding a tractor and getting ready for hunting season. Tr. at 66. Plaintiff testified that his former employer asked him to cut vacant lots with a bush hog, but that he could only do it for three hours at a time because of problems with his back and abdomen. *Id.* He indicated he enjoyed hunting, but was unable to drag a deer from the woods. *Id.* Plaintiff denied working or hunting after February 2011. Tr. at 67.

The ALJ asked Plaintiff about a reference in the record to him boating and fishing on Lake Moultrie. Tr. at 68. Plaintiff indicated he took his family to his uncle's lake house in July 2012. *Id.* He stated he took his children for rides on his uncle's boat twice during the week, but he was unable to operate the boat for more than an hour each time because the choppiness of the water and the bouncing of the boat increased his pain. *Id.*

Plaintiff testified he did not attend his children's school events or help his wife to prepare meals or do laundry for them, but that he went to the park to ride bicycles with his children approximately once a month. Tr. at 57. He indicated he could be active for a maximum of three to four hours at a time. Tr. at 63.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") William Stewart reviewed the record and testified at the hearing. Tr. at 69–71, 73–78. The VE categorized Plaintiff's PRW as a construction supervisor, *Dictionary of Occupational Titles* ("*DOT*") number 860.131-018, as medium with a specific vocational preparation ("SVP") of eight; a home builder, *DOT* number 869.281-014, as medium with a SVP of seven; and a bush hogger, *DOT* number 929.683-014, as medium with a SVP of three. Tr. at 70–71. He noted that Plaintiff's work as a construction supervisor and a home builder were light as performed. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work; push and pull ten pounds occasionally and less than 10 pounds frequently; occasionally climb ramps and stairs, stoop, and kneel; never crouch, balance on dangerous surfaces, crawl, or climb ladders, ropes, or scaffolds; and should not work around hazards such as unprotected heights or dangerous moving machinery. Tr. at 74.

23

The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked the VE to identify unskilled jobs that individual could perform. Tr. at 75. The VE identified jobs as an order clerk, *DOT* number 209.567-014, as sedentary with a SVP of two, with 2,200 positions in South Carolina and 55,000 positions nationally; a table worker, *DOT* number 739.687-182, with 3,400 jobs in South Carolina and 100,000 jobs nationally; an assembler, *DOT* number 734.687-018, with 3,500 positions in South Carolina and over 100,000 positions nationally; and a machine tender, *DOT* number 781.682-010, as sedentary with a SVP of two, with 1,400 positions in South Carolina and 40,000 positions nationally. Tr. at 75–76. The ALJ asked the VE to further assume that the individual should work primarily with things rather than people and should do no work in close proximity to others. Tr. at 76. She asked the VE if the individual could still perform the jobs previously identified. *Id.* The VE testified that the individual could perform the same jobs, but that the number of jobs would be reduced between 25 and 50 percent. Tr. at 76–77. The ALJ asked the VE to assume the individual could not maintain attention and concentration for at least two hours at a time due to interruptions from pain. Tr. at 77. The VE indicated that an individual limited in such a manner could not maintain persistence or pace to be productive on a reliable and sustained basis. *Id.*

Plaintiff's attorney asked the VE to assume the individual would miss two to three days of work every six weeks because of Remicade infusions. Tr. at 77. He asked if that factor would rule out any of the jobs identified in response to the other hypothetical

questions. *Id.* The VE testified that it would and that "as long as someone was missing that much work, they would not be job rated for any kind of work." Tr. at 78.

        2.     The ALJ's Findings

In her decision dated October 26, 2012, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
2. The claimant has not engaged in substantial gainful activity since February 23, 2011, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe combination of impairments: Crohn's disease with ileostomy, regional enteritis, osteopenia, vitamin D deficiency, depression, anxiety, and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with pushing and pulling 10 pounds occasionally and lesser amounts frequently, but never crouching, balancing for safety on dangerous surfaces, crawling or climbing ladders, ropes, and scaffolds. He is limited to occasional stooping, kneeling, and climbing ramps and stairs. He cannot work around hazards such as dangerous moving machinery and unprotected heights. Further, the claimant should work primarily with things, rather than people, and should not work in close proximity to others.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant was born on October 7, 1978, and was 32 years old, which is defined as a younger individual age 18–44, on the amended alleged disability onset date (20 CFR 404.1563).
8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564).
9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 23, 2011, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 40–52.

D.    Appeals Council Review

On March 31, 2014, the Appeals Council issued a notice denying Plaintiff's request for review. Tr. at 1–6. It indicated it considered the following evidence that was not presented prior to the ALJ's decision: third party correspondence from Keith S. Robinson, dated June 20, 2012 (6 pages); third party correspondence from Heather Sederbaum, dated February 5, 2013 (4 pages); third party correspondence from H. Bruce Dingler, dated February 6, 2013 (5 pages); third party correspondence from Brenda Sederbaum, dated February 7, 2013 (6 pages); third party correspondence from Dr. Jim Palmer (minister), undated (3 pages); medications, CVS pharmacy, dated September 19, 2008, to January 11, 2013 (13 pages); medications, dated January 29, 2013, to February 14, 2013 (5 pages); medical records from Rudolph P. Rustin, M.D., dated December 14, 2007, to January 4, 2008 (6 pages); medical records from South Carolina Department of Health and Human Services, dated November 9, 2007, to November 20, 2012 (26 pages); medical records from PIS, dated April 18, 2008, to January 15, 2013 (21 pages); medical records from Aaron Domm, M.D., dated March 9, 2012, to January 15, 2013 (13 pages); medical records from Susan Weathers, M.D., dated June 11, 2012, to February 5, 2013

(17 pages); medical records from Susan Weathers, M.D., dated May 25, 2012, to February 27, 2013 (6 pages); and medical records from Thomas G. Gourdin, M.D., dated April 14, 2008, to March 1, 2013 (19 pages). Tr. at 5–6. The Appeals Council concluded that the new evidence did not provide a basis for changing the ALJ's decision. Tr. at 2. It further found that the following records concerned a period after the ALJ's decision: Jorge A. Largares Garcia, M.D., dated February 6, 2013 (4 pages); David Brindli, M.D., dated February 6, 2013, to February 8, 2013 (8 pages); and Dennis A. Kubinski, M.D., dated February 11, 2013 (5 pages). *Id.*

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the Appeals Council failed to consider new and relevant information;

2)    the ALJ erred in giving no weight to the decision by the state of South Carolina that Plaintiff was totally disabled and that his Crohn's disease and related conditions met or equaled Listing 5.06;

3)    the ALJ did not adequately analyze Plaintiff's credibility; and

4)    the ALJ assessed an improper RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

1.      New Evidence Submitted to Appeals Council

Plaintiff argues the Appeals Council erred in failing to admit evidence from Dr. Brandli (February 6–8, 2013), Dr. Kubinski (February 11, 2013), and Dr. Lagares Garcia

(February 6, 2013). [ECF No. 13 at 32]. He maintains this evidence was directly related to the period prior to the ALJ's decision. *Id.* at 32–33. Plaintiff further argues that the Appeals Council did not properly consider the new evidence it admitted and that the new evidence required the case be remanded. *Id.* at 33.

The Commissioner argues the evidence from Drs. Brandli, Kubinski, and Lagares Garcia was neither new nor material because it related to a period after the ALJ's decision. [ECF No. 15 at 15–16]. She further maintains that the new evidence the Appeals Council admitted did not indicate any additional functional limitations and did not provide a basis for changing the ALJ's decision. *Id.* at 17–18.

The SSA's regulations "specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.970(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, *citing Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 416.970(b). "[I]f the Appeals Council finds that the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence currently of record,'" it shall grant the request for review and either issue a new

decision or remand the case to the ALJ for reconsideration of the evidence. *Meyer*, 662 F.3d at 705, *citing* 20 C.F.R. § 404.967, 404.977(a), and 404.979. However, if after reviewing the entire record, including the new and material evidence, the Appeals Council "finds the ALJ's action, findings, or conclusions not contrary to the weight of the evidence, the Appeals Council can simply deny the request for review" without explaining its rationale. *Id.*

The Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012), suggests that evidence created after the ALJ's decision may be considered as new and material evidence and given retrospective consideration under certain circumstances. While *Bird* specifically addressed evidence created after a claimant's date last insured, this court has suggested its holding extends to situations in which evidence arises after an ALJ's decision, but before the Appeals Council makes a decision to grant or deny review. *See Dickerson v. Colvin*, C/A No. 5:12-33-DCN, 2013 WL 4434381, at *14 (D.S.C. Aug. 14, 2013) (holding that a medical opinion dated more than a year after the ALJ's decision was new and material evidence that warranted remand). *But see Evans v. Colvin*, C/A No. 8:13-1325-DCN, 2014 WL 4955173, at *28 (D.S.C. Sept. 29, 2014) (holding that new evidence did not require reconsideration of the ALJ's decision because the new evidence did not appear to have any bearing upon whether the plaintiff was disabled during the time period relevant to the ALJ's decision).

The undersigned recommends the court find that the Appeals Council erred in determining that the records from Drs. Brandli, Kubinski, and Lagares Garcia were not new and material. Although the records the Appeals Council declined to admit were for a

period approximately three-and-a-half months after the ALJ's decision, they were arguably relevant to the period prior to the ALJ's decision. The Fourth Circuit articulated in *Bird* that its decisions in *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969) and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005) provided that "retrospective consideration of evidence" was "appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." 699 F.3d at 341, citing *Moore*, 418 F.3d at 1226. Plaintiff's condition deteriorated between September 2012 and February 2013, but it is reasonably likely that the objective tests and diagnoses rendered in February 2013 were related to Plaintiff's earlier complaints of pain and the evidence in September and October 2012 of maceration of Plaintiff's groin folds, redness in his scrotum, and the presence of a varicocele. *See* Tr. at 643, 673. Additionally, the Appeals Council admitted other evidence for the same period that concerned similar complaints. *See* Tr. at 626–27, 639–40, 662–63, 672. The records from Drs. Brandli, Kubinski, and Lagares Garcia were new and material in that they indicated fistula formation, which the ALJ found not to be present at the time of her decision. *Compare* Tr. at 15, 19, with Tr. at 41. Therefore, the Appeals Council erred in declining to admit this evidence because it was not duplicative, it was reasonably linked to the time period prior to the ALJ's decision, and it arguably might have changed the outcome.

The undersigned also recommends a finding that the Appeals Council erred in denying review in light of the new evidence that it incorporated into the record. Among that evidence were two opinions from Dr. Weathers, one of which was rendered prior to the ALJ's decision. *See* Tr. at 656, 658. In *Meyer*, the Fourth Circuit indicated "[i]n view

of the weight afforded the opinion of a treating physician, *see* 20 C.F.R. § 404.1527(d)(2), analysis from the Appeals Council or remand to the ALJ for such analysis would be particularly helpful when the new evidence constitutes the only record evidence as to the opinion of a treating physician." 662 F.3d at 706. Here, as in *Meyer*, the opinion statements from Dr. Weathers that were submitted to the Appeals Council were the only opinions in the record from a physician who treated Plaintiff for his physical impairments during the relevant period. Although Dr. Weathers opined that Plaintiff was disabled, which is an opinion on an issue reserved to the Commissioner and entitled to no particular weight, she also indicated that Plaintiff required 24-hour care and could not perform many activities of daily living unassisted and without pain. *See* Tr. at 656, 658; *see also* 20 C.F.R. § 404.1527(d). Dr. Weathers indicated Plaintiff was limited to a much greater degree than the ALJ found him to be. Therefore, it was reasonably likely that the ALJ's decision would have been different if she had reviewed Dr. Weathers' opinion. Also, as discussed above, the new evidence submitted to the Appeals Council indicated Plaintiff was again experiencing fistula formation. *See* Tr. at 15, 19, 626–27, 639–40, 662–63, 672. Because it is reasonably possible that the opinion of Plaintiff's treating physician and the evidence of a progression of his impairment might have changed the ALJ's decision, the undersigned recommends a finding that the Appeals Council erred in denying review.

In light of the undersigned's recommendations, the lay witness statements submitted to the Appeals Council should also be considered on remand.

2.        State Agency Disability Decision

Plaintiff argues the ALJ erred in giving no weight to the state of South Carolina's finding that Plaintiff was disabled and that his impairments met or equaled Listing 5.06. [ECF No. 13 at 35]. He contends that the ALJ gave invalid reasons for dismissing the state agency's decision. *Id.*

The Commissioner argues the ALJ carefully considered the decision from the SCDHHS and concluded it was not entitled to any weight. [ECF No. 15 at 20]. She maintains the SCDHHS used a different definition of disability than that used by the SSA because it allowed approval of benefits for individuals who were working and that it was impossible for Plaintiff to meet Listing 5.06 at the time the SCDHHS's decision was rendered because he was working. *Id.* at 20–21. Finally, the Commissioner points out that Plaintiff continued to work for two years after the SCDHHS's decision was rendered. *Id.*

Disability decisions rendered by other governmental and nongovernmental agencies must be considered, along with all other relevant evidence in the case record. SSR 06-3p. If the record contains a disability decision from another agency, the ALJ should explain the consideration given to the other agency's findings. *Id.* Furthermore, the Fourth Circuit has indicated that greater weight should be accorded to other agency disability decisions that are rendered in a manner similar to that of the SSA. In *Bird*, the court held that the SSA must give substantial weight to a VA disability rating. 699 F.3d at 343. The court recognized that because the VA and the SSA disability programs have related purposes and evaluation methodologies, VA disability determinations were particularly relevant to the disability determination process. *Id.*

However, the SSA is not bound by the decisions of other agencies. 20 C.F.R. § 404.1504.

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rule and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency (e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company) that you are disabled or blind is not binding on us.

*Id.* After examining the other agency's decision and the evidence it relied upon to support its conclusion, the ALJ should determine if the same finding is supported under the SSA's rules and regulations. *See id.*; *see also* SSR 06-3p.

The ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. at 40. She specifically considered whether Plaintiff's Crohn's disease met or medically equaled the requirements of Listing 5.06, but found that the evidence did not indicate Plaintiff's impairment met part A of the Listing. Tr. at 41. The ALJ found that the evidence did not suggest Plaintiff's impairment met two of the criteria in part B of the Listing. *Id.*

The ALJ specifically considered and discussed the SCDHHS decision, but accorded it no weight. Tr. at 49–50. She indicated the SCDHHS decision was issued two years before Plaintiff's AOD of disability and provided "little insight into the claimant's work-related abilities and limitations during the relevant period." Tr. at 50. She also pointed out that the HO's finding was not supported by the state agency medical consultants' findings that Plaintiff's impairment did not meet or equal the Listing. *Id.*

Because the SCDHHS based its decision on a finding that Plaintiff's impairment met Listing 5.06, the ALJ properly looked to that Listing. Listing 5.06 requires a diagnosis of inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically-acceptable imaging, or operative findings. The claimant's impairment must also meet or equal part A or part B, which require the following:

> A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6–month period; or
>
> B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6–month period:
> 1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or
> 2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or
> 3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
> 4. Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
> 5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or
> 6. Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 5.06.

The undersigned recommends the court find the ALJ's decision to accord no weight to the decision of the SCDHHS to be supported by substantial evidence. Plaintiff correctly asserts that the SCDHHS qualification criteria are markedly similar to those of

the SSA, except that the SCDHHS dispenses with step one in the SSA's five-step process and allows benefits for individuals who are engaging in substantial gainful activity. *See* [ECF No. 13 at 35]; *see also* Tr. at 355–58. Had the ALJ accorded no weight to the SCDHHS decision merely because Plaintiff did not meet the step one criteria at the time the decision was rendered, but Plaintiff later satisfied the step one criterion when he stopped working, the undersigned might be inclined to recommend a finding of error based on the Fourth Circuit's decision in *Bird*. However, the ALJ explained that deviation from the SCDHHS decision was appropriate because it was rendered more than two years before Plaintiff's AOD and because Plaintiff's impairment did not meet or equal the criteria set forth under Listing 5.06. *See* Tr. at 50.

Although Plaintiff argues that his condition did not improve after the SCDHHS decision was rendered, a review of the record reveals that his medical condition changed from early 2008 to the time of the ALJ's decision. *See* [ECF No. 16 at 3]. In late-2007 and early-2008, Plaintiff was having problems with abscesses and fistula formation. *See* Tr. at 350–51, 575, 676–77. Plaintiff subsequently initiated Remicaid therapy and the record before the ALJ indicated no evidence of abscesses or fistula formation between mid-2008 and mid-2012.[7] Therefore, it was appropriate for the ALJ to support her decision to accord no weight to the SCDHHS decision by pointing out that it was

---

[7] The records submitted to the Appeals Council indicate the presence of fistulas in February 2013, but the ALJ appropriately concluded that the evidence between Plaintiff's AOD and the date of his hearing did not suggest he was experiencing the same problems that plagued him in early 2008.

rendered two years before Plaintiff's AOD, given the lack of abscesses and fistula formation in the period following the SCDHHS decision.

The ALJ also properly found that Plaintiff's impairment did not meet Listing 5.06, despite the SCDHHS decision to the contrary. *See* Tr. at 50. The SCDHHS decision cited Listing 5.06 as being one for "Chronic Ulcerative or Granulomotous Colitis (demonstrated by endoscopy barium enema, biopsy, or operative findings)." Tr. at 357. The SCDHHS decision provided the following under part C: "[i]ntermittent obstruction due to intractable abscesses, fistula formation, or stenosis." *Id.* Although the HO indicated she used the "April 1, 2008 Edition" of "20 CFR Ch. III, Pt. 404, Subpt, P, App. 1, Part A, § 5.06," the version of Listing 5.06 set forth in the paragraph above is the same as all versions in effect since June 19, 2007, and does not include a part C or the language set forth in the SCDHHS decision. *Compare* 20 C.F.R. Pt. 404, Subpt P, App'x 1, § 5.06 (effective February 20, 2007 to June 18, 2007), *with* 20 C.F.R. Pt. 404, Subpt P, App'x 1, § 5.06 (effective June 19, 2007 to December 17, 2007, *et seq.*). The old Listing 12.06(C) is similar to the current Listing 12.06(B)(4), but a claimant must satisfy two criteria under part B to meet Listing 12.06. Under the pre-June 2007 criteria, a claimant could meet the Listing by proving only the presences of intractable abscesses or fistula formation, but under the subsequent requirements, a claimant must meet one of the five other criteria in addition to having intractable abscesses or fistula formation. *See id.* Thus, the HO found that Plaintiff was disabled based on lesser requirements than those in effect when her decision was rendered or at any subsequent time. The undersigned recommends the court find the ALJ properly rejected the SCDHHS finding that Plaintiff met Listing

5.06 where the record indicates the proper criteria were not considered by the SCDHHS at the time the decision was rendered. *See* Tr. at 41.

The undersigned further recommends the court reject Plaintiff's argument that the ALJ failed to consider whether his impairment equaled Listing 5.06. The ALJ explicitly found that Plaintiff's Crohn's disease did not medically equal the requirements of Listing 5.06. Tr. at 41. Although Plaintiff argues the ALJ only discussed why his impairment failed to meet the Listing and neglected to discuss with specificity whether it equaled the Listing, Plaintiff likewise does not cite with specificity to evidence that suggests his impairment equals the Listing. *See* ECF Nos. 13 at 36 and 16 at 3. In the absence of evidence to the contrary, the undersigned recommends the court find the ALJ adequately concluded that Plaintiff's impairment did not equal Listing 5.06.

### 3. Credibility

Plaintiff argues the ALJ took isolated statements from the treatment records out of context to rationalize her credibility finding. [ECF No. 13 at 37]. He maintains the ALJ did not cite specific evidence in support of her findings. *Id.* at 37–38.

The Commissioner argues the ALJ properly evaluated Plaintiff's credibility and determined that his statements were not entirely credible. [ECF No. 15 at 22]. She points out that Plaintiff's statements in his disability reports were inconsistent with his testimony. *Id.* at 22–23.

Allegations of pain or other symptoms in the absence of medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment cannot be the basis for a disability finding. SSR 96-7p. The ALJ should only consider the

intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* "[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. *Id.* To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning their intensity, persistence, and limiting effects "are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. at 45. She explained that Plaintiff's statement that he could not lift over two pounds was not corroborated by a treating physician and that his allegation that he was "down" for two to three days following Remicade infusions was not reflected in his treatment notes. *Id.* The ALJ pointed out that Plaintiff's reported physical abilities declined

41

significantly from early function reports to later function reports, but that the medical evidence failed to document a significant change in his condition that would support such a decline in functioning. *Id.* The ALJ also acknowledged that Plaintiff did not stop work because of his impairments, but, instead, lost his job due to an economic downturn. Tr. at 46. The ALJ indicated Plaintiff's "allegations of significant ongoing pain are also inconsistent with the medical evidence of record." *Id.*

The undersigned recommends a finding that the ALJ failed to consider the entire record in assessing Plaintiff's credibility, as required by SSR 96-7p. Although the ALJ indicated Plaintiff did not complain about side effects from Remicaid infusions or ongoing pain, a review of the record reveals evidence to the contrary. During an infusion visit on July 25, 2011, Plaintiff complained to Dr. Saito of nausea, vomiting, abdominal cramping, bloody stools, headache, weakness, fatigue, numbness/tingling, and joint swelling. Tr. at 525. At his September 20, 2011, infusion visit, Plaintiff reported nausea, vomiting, diarrhea three times per day, bloody stools, headache, weakness, swelling on the left side of his back, fatigue, numbness/tingling, joint swelling, and body aches. Tr. at 519. In a function report dated November 15, 2011, Mrs. Sederbaum wrote that Plaintiff had Remicade infusions every six weeks that resulted in him being "down for (3) three days." Tr. at 280. On December 5, 2011, Dr. Domm recommended Plaintiff establish care for chronic pain management. Tr. at 486. Plaintiff established pain management treatment with Dr. Mullen on December 28, 2011, and was prescribed Methadone. Tr. at 553. On February 6, 2012, Plaintiff complained of nausea, vomiting, and fatigue during his infusion therapy. Tr. at 512. Plaintiff complained of nausea, vomiting, diarrhea five times

per day, numbness and tingling in his arms, joint swelling, and muscle spasms during an infusion visit on March 27, 2012. Tr. at 502. During his May 14, 2012, infusion appointment, Plaintiff reported low back pain, diarrhea, abdominal cramping, and pain. Tr. at 495, 500. Plaintiff reported his pain to be an eight of ten at an infusion visit on July 17, 2012. Tr. at 613. The next day, Dr. Mullen doubled Plaintiff's Methadone dosage to 40 milligrams twice daily. Tr. at 566. The ALJ's indications regarding Plaintiff's complaints of pain and his reaction to Methadone therapy are refuted by the evidence set forth above. Because the ALJ failed to recognize a significant body of evidence that contradicted her assessment of Plaintiff's credibility, the undersigned recommends the court find that her credibility determination was not supported by the evidence in the case record. *See* SSR 96-7p.

### 4.    RFC

Plaintiff argues the ALJ did not adequately develop and explain the RFC finding. [ECF No. 13 at 38]. He maintains the ALJ's finding that he can sustain a reduced range of sedentary work is inconsistent with the evidence. *Id.* He contends the ALJ ignored the opinion evidence and statements in the record that suggested greater limitations than those assessed and failed to consider all of his impairments and their related limitations. *Id.* at 39–40.

The Commissioner argues the ALJ provided a comprehensive and detailed explanation of her findings with respect to Plaintiff's RFC. [ECF No. 15 at 23].

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the

limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* It must be based on all of the relevant evidence in the case record, which includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.*

The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the residual functional capacity to perform a reduced range of sedentary work and that he "should work primarily with things, rather than people, and should not work in close proximity to others." Tr. at 44. The ALJ indicated she considered all of Plaintiff's symptoms and the opinion evidence in the record. *Id.*

The undersigned recommends the court find the ALJ failed to consider indications in the record that Plaintiff would miss work more frequently than is generally tolerated in

a work setting. Although the ALJ considered Ms. Mudger's letter that indicated Plaintiff "had to leave work early or come in late due to his illness," she accorded it no weight because Plaintiff was able to engage in substantial gainful activity during the three-and-a-half year period after the letter was written. Tr. at 50. The ALJ relied upon Mr. Libhart's letter that indicated Plaintiff worked well with others and would be a valuable employee to any company that hired him to refute Ms. Mudger's statement. *See id.* However, Mr. Libhart's statement was not contrary to Ms. Mudger's indication because he did not address Plaintiff's work attendance. *See id.* Plaintiff's work activity report and Mrs. Sederbaum's letter provided support for Ms. Mudger's indication that Sunburst Properties tolerated Plaintiff's medically-necessary absences and suggested that Plaintiff continued to miss work regularly after Ms. Mudger's 2007 letter. Tr. at 229–31, 315–16. The record reflects that Plaintiff worked for Sunburst Properties until he was laid off due to an economic downturn in February 2011. Tr. at 59, 367. During physician's visits in the months leading up to Plaintiff's termination, he complained of increased pain and pressure in his abdomen and requested Vicodin to fulfill his job duties. *See* Tr. at 371, 373, 542. Plaintiff testified that he was unable to find subsequent employment because of his impairments and the likelihood that he would miss days of work. *See* Tr. at 59. Aside from according no weight to Ms. Mudger's letter, the ALJ neglected to address Plaintiff's testimony and other indications in the record that Plaintiff would regularly miss work. *See* Tr. at 60, 229–31, 315–16. During the hearing, the VE testified that an individual who missed two to three days of work every six weeks would be unable to engage in work activity. *See* Tr. at 78. In light of the ALJ's failure to address this evidence in the

face of vocational testimony that suggested it was particularly relevant to the issue of disability, the undersigned recommends the court find the ALJ erred.

Because the undersigned has recommended a finding that the ALJ erred in assessing Plaintiff's RFC, the undersigned finds it unnecessary to address Plaintiff's additional arguments regarding the RFC assessment.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 19, 2015                                Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).